**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

---

| | |
|---|---|
| KENDRA HARPER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NBI, INC.,<br><br>Defendant. | CASE NO. 24-CV-644 |

---

**RESPONSE TO DEFENDANT'S MOTION TO DISMISS**

---

Plaintiff Kendra Harper submits this response in opposition to the motion to dismiss (ECF No. 13 (the "Motion" or "Mot.")) field by Defendant NBI, Inc.

## INTRODUCTION

This case is about Defendant NBI, Inc.'s systematic and routine violation of consumers' privacy rights as established by the Video Privacy Protection Act ("VPPA"). In the two years preceding the filing of this action, Defendant regularly disclosed its consumers' personally identifiable information to Meta Platforms, Inc. ("Meta"). *See* 18 U.S.C. § 2710(b)(1). This personally identifiable information includes both the consumers' Facebook IDs and URLs identifying and containing the names of the videos or subscriptions they requested or obtained from Defendant. *See* 18 U.S.C. § 2710(a)(3). The allegations presented in the Amended Complaint (the "Complaint") state a claim under the VPPA, and Defendant's motion to dismiss should be denied.

## BACKGROUND

On September 11, 2024, Plaintiff filed a complaint alleging that Defendant violated the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710 by knowingly disclosing her and the other putative class members' personally identifiable information ("PII") to Meta without consent. ECF No. 1. Defendant moved to dismiss on October 22, 2024. ECF No. 8. Plaintiff filed an amended complaint on November 5, 2024, the operative complaint in the case. ECF No. 11.

The Complaint alleges that "Defendant has systematically transmitted its customers' personally identifying subscription and video viewing information to Meta using a snippet of programming code called the "Meta Pixel," which Defendant chose to install on its nbi-sems.com website in violation of the VPPA. *Id.* at ¶ 2. It then sets forth the factual basis of the claim, starting with the allegation that Defendant is a "video tape service provider." ECF No. 11 at ¶ 78. The Complaint details how Defendant operates the website nbi-sems.com where it sells "a wide variety of prerecorded video materials to consumers across the United States." *Id.* at ¶ 15. It states that nbi-sems.com is "an online digital library of video materials" on which "Defendant sells approximately 2,400 prerecorded videos, 350 'live' webinars, 10 interactive elearning courses, 4 podcasts, and admission to 10 in-person events." *Id.* at ¶ 15.

Next, the Complaint alleges that Defendant disclosed Plaintiffs' and its other consumers' "personally identifiable information." The Complaint alleges that the Plaintiff and putative class members have Facebook accounts. *Id*. at ¶¶ 11, 69. It explains how each person with a Facebook account is assigned a unique, numerical Facebook ID ("FID") by Meta. *Id*. at ¶¶ 3, 46. These FIDs are personally identifying because they are each indexed to an individual's Facebook account, which includes the individual's name and other personally identifying information. *Id*. at ¶ 3, 46, 63 ("With only a person's FID and the video content name or URL that the person requested on

Defendant's website—all of which Defendant knowingly provides to Meta—any ordinary person could learn the identity of the person to whom the FID corresponds and the specific video products or services that this person requested."). It then alleges that Defendant transmitted this FID to Meta, along with the titles and URLs of the videos its customers requested or obtained. ECF No. 11 at ¶¶ 3, 4, 11, 42 ("[W]hen a consumer requests or obtains a specific video, the Meta Pixel technology on Defendant's website transmits the consumer's personally identifying information and detailed information concerning the specific interactions she or he takes on the website (including the consumer's Private Viewing Information revealing the specific videos that he or she requested or obtained) to Meta.",); *id*. at ¶ 52 ("Every transmission to Meta accomplished through the Meta Pixel includes at least two elements: (1) the website visitor's FID and (2) the URL of the webpage triggering the transmission."); *id*. at ¶ 59 ("When a person requested or obtained a subscription to or videos from Defendant's website, Defendant used [] the Meta Pixel to disclose to Meta the unencrypted FID of the consumer and the subscription and specific videos that he or she requested or obtained from Defendant's website."); *id*. ("[W]hen a user clicked on a video title, added it to cart, and initiated checkout, Defendant transmitted to Meta through the pixel the user's FID, along with the title and URL of the video the person obtained or requested at each of those steps."); *id*. at ¶ 61 ("Once the user completed the purchase, the pixel sent notice of the purchase completion to Meta, along with the user's FID . . . ."); *id.* at ¶ 80 ("Defendant knowingly disclosed Plaintiff's and Class members' subscription purchases and Private Viewing Information to Meta").

Third, the Complaint alleges that Defendant knowingly installed Meta Pixel and used it to transmit its consumers' Facebook IDs and the names of the videos those consumers requested or obtained to Meta. *Id*. at ¶¶ 1, 58–68, 80, 82. Finally, the Complaint alleges that the disclosures were not authorized. *Id.* at ¶¶ 4, 12, 67, 81.

On November 19, 2024, Defendant filed the instant Motion. ECF No. 13. In it, Defendant argues the Amended Complaint fails to state a VPPA claim because (1) Defendant is not a "video tape service provider" because it is a 501(c)(3) organization and is thus, not "in the business" of anything and because legal education courses are not "similar audio visual materials" that Congress intended to regulate with the VPPA as used in 18 U.S.C. § 2170(a)(4); and (2) Plaintiff does not plausibly alleged that Defendant disclosed her specific personally identifiable information. These arguments are baseless. Neither non-profit entities nor video recorded CLE's are exempted from the VPPA and Defendant does not cite a single authority to the contrary. As to its argument that Plaintiff has failed to plausibly allege Defendant has violated the VPPA by its disclosures to Meta, every court to have considered the argument that defendant raises here has rejected it. Plaintiff has plausibly alleged an entitlement to relief under the VPPA. The Motion should be denied.

**VIDEO PRIVACY PROTECTION ACT**

The United States Congress passed the VPPA in 1988. President Ronald Reagan signed the legislation into law that same year. It is a relatively simple statute, designed to protect the privacy interests of consumers who request or obtain prerecorded video materials from providers of such services.

The VPPA defines the terms "consumer," "personally identifiable information," and "video tape service provider." The VPPA defines a "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). It defines "personally identifiable information" as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). It defines a "video tape service provider," in relevant part, as "any person,

engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials. . . ." 18 U.S.C. § 2710(a)(4).

The VPPA codifies a consumer's privacy right in the video content she or he views. It provides that a "video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for the relief provided [below]." 18 U.S.C. § 2710(b). Several exceptions to violations of the law are also enumerated, none which the Motion raises.

## APPLICABLE LEGAL STANDARD

When reviewing a motion to dismiss, "the court must accept all well-pleaded, factual allegations as true and draw all reasonable inferences in the plaintiff's favor." *Est. of Mouradian by Mouradian v. Jackson Cnty.*, 23-CV-167-WMC, 2024 WL 1675039, at *3 (W.D. Wis. Apr. 18, 2024) (citing *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 821 (7th Cir. 2019)). The motion to dismiss phase of proceedings "is not an opportunity for the court to find facts or weigh evidence." *My Health, Inc. v. Gen. Elec. Co.*, 15-CV-80, 2015 WL 9474293, at *2 (W.D. Wis. Dec. 28, 2015). Indeed, generally "a district court cannot consider evidence outside the pleadings to decide a motion to dismiss without converting it into a motion for summary judgment." *Jackson v. Curry*, 888 F.3d 259, 263 (7th Cir. 2018).

To survive dismissal, a plaintiff's complaint must plead "enough facts to state a claim to relief that is plausible on its face." *O'Boyle v. Real Time Resolutions, Inc.*, 910 F.3d 338, 342 (7th Cir. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

A "plausible claim" under the VPPA requires a plaintiff to allege that (1) the defendant is a "video tape service provider," (2) the defendant disclosed "personally identifiable information concerning any customer" to "any person," (3) the disclosure was made knowingly, and (4) the disclosure was not authorized by the statutory exceptions. *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015). Plaintiff has clearly and sufficiently alleged all four elements here.

However, Defendant argues that Plaintiff has not plausibly alleged that Defendant is a "video tape service provider" because (1) as a 501(c)(3) organization, Defendant cannot be in the "business" of anything; and (2) legal education courses are not "prerecorded video cassette tapes or similar audio visual materials" that Congress intended to regulate with the VPPA. ECF No. 14. Both contentions fail. Defendant attempts to write limitations into the VPPA where none exist. If Congress had intended to exclude non-profits from the requirements of the VPPA, it would have said so. But Congress did not. If Congress had intended to exclude educational videos from the requirements of the VPPA, or have the VPPA apply based on the content of video, it would have said so. Again, Congress did not. Defendant does not and cannot cite to a single case holding what it argues here.

Finally, Defendant argues that Plaintiff does not plausibly allege that Defendant disclosed her personally identifiable information. This also fails. Plaintiff alleges that Defendant disclosed to Meta her FID, along with the titles and URLs of the videos she requested or obtained from Defendant's website. As courts across the country have found, allegations of disclosure of this information are sufficient to allege disclosure of "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider" such that a plaintiff has stated a claim.

Accordingly, Defendant's motion should be denied.

## I. Plaintiff has plausibly alleged that NBI is a video tape service provider.

### A. The VPPA applies to nonprofit entities.

Defendant's argument that nonprofit organizations can never be video tape service providers under the VPPA is flawed and unsupported by the text of the statute or any relevant case law. Not only is it unsupported by the case law, but the Supreme Court has made clear that "the nonprofit character of an enterprise does not place it beyond the purview of federal laws regulating commerce." *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 584 (1997). Despite this Supreme Court guidance, Defendant urges this Court to create a limitation to the definition of "video tape service provider" where there is none and exclude nonprofits completely from the requirements of the VPPA. This Court should not and cannot do so.

The VPPA provides that "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person . . . ." It defines a "video tape service provider" as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials. . . ." 18 U.S.C. § 2710(a)(4). The statute does not limit the definition of a video tape service provider any further.

The Complaint sufficiently alleges that Defendant is a "video tape service provider" under this definition. The Complaint alleges that Defendant "operates an online digital library of video materials on its website nbi-sems.com, where it is engaged in the business of selling, *inter alia*, a wide variety of prerecorded video materials to consumers across the United States." ECF No. 11 at ¶ 15. It alleges that Defendant sells access to over 2,400 prerecorded videos on its website, which make up the vast majority of Defendant's products. *Id.* It alleges that Defendant "allows

persons to become digital consumers of its online-based video products and services by subscribing to or purchasing access to prerecorded videos on its website." *Id.* at ¶ 58. And it alleges that Defendant's sales of subscriptions and access to the videos affect interstate commerce. *Id.* at ¶ 78. Accordingly, the Complaint contains much more than "conclusory statements" and "threadbare recitals of a cause of action." The Complaint clearly, repeatedly, and sufficiently alleges that Defendant is a video tape service provider as defined by the VPPA.

Defendant, however, argues that it is a 501(c)(3) organization and thus, it is not "in the business" of anything. Consequently, Defendant argues, it can never be a video tape service provider. In other words, Defendant asks this Court to hold that nonprofit organizations *per se* can never be "engaged in business" because "engaged in business" requires a profit motive, and are therefore, nonprofits are excluded from the requirements of the VPPA.

This argument fails because it is well established that "the nonprofit character of an enterprise does not place it beyond the purview of federal laws regulating commerce." *Camps Newfound*, 520 U.S. at 584 (holding Commerce Clause applies to nonprofit institutions, as "entities in both categories are major participants in interstate markets"). As the Supreme Court explained, "Nothing intrinsic to the nature of nonprofit entities prevents them from engaging in interstate commerce," particularly because "they purchase goods and services in competitive markets, offer their facilities to a variety of patrons, and derive revenues from a variety of sources, some of which are local and some out of State." *Id.* at 585–86.

The Supreme Court's holding applies here. The VPPA regulates video tape service providers whose business affects interstate or foreign commerce. 18 U.S.C. § 2710(a)(4). Therefore, "the nonprofit character of an enterprise does not place it beyond the purview of" the VPPA. *Id.* at 584. Simply put, under Supreme Court precedent, nonprofits do not escape the

regulations of the VPPA simply because they do not operate with a profit motive. Nonprofits who create online video content and sell access to it to people across the country, just like Plaintiff alleges Defendant does here, are still "deriv[ing] revenues from a variety of sources, some of which are local and some out of State," and "purchas[ing] goods and services in competitive markets." Consequently, they can be video tape service providers under the VPPA. *See also Associated Press v. Nat'l Lab. Rels. Bd.*, 301 U.S. 103 (1937) (nonprofit institutions are subject to laws regulating commerce); *National Collegiate Athletic Assn. v. Board of Regents of Univ. of Okla.,* 468 U.S. 85, 100, n. 22, (1984) (nonprofit institutions are subject to federal antitrust laws).

Indeed, one federal district court recently rejected the same argument Defendant makes here on analogous facts. In *Krassick v. Archaeological Institute of America*, 21-CV-180, 2022 WL 2071730 (W.D. Mich. June 9, 2022), the court analyzed whether the phrase "engaged in the business of" in the Michigan Preservation of Personal Privacy Act[1]—a state statute analogous to the VPPA—required a profit motive, and found it did not. *Id.* The *Krassick* plaintiff alleged that the defendant, a 501(c)(3) nonprofit, had violated the Michigan Preservation of Personal Privacy Act by disclosing records concerning her purchases of its magazines to third parties. In moving to dismiss the complaint, the defendant argued, as does Defendant here, that the statute did not apply

---

[1] The Michigan Preservation of Personal Privacy Act states, in relevant part, the following:

> Sec. 2. (1) Subject to subsection (2) and except as provided in section 3 or as otherwise provided by law, a person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials, sound recordings, or video recordings shall not knowingly disclose to any person, other than the customer, a record or information that personally identifies the customer as having purchased, leased, rented, or borrowed those materials from the person engaged in the business.

Mich. Comp. Laws Ann. § 445.1712.

to it on the ground that it was not a "person . . . engaged in the business of selling" magazines because it was not doing so for a profit. *Krassick*, 2022 WL 2071730, at *5.

In finding that "engaged in business" did not require a profit motive, the *Krassick* court looked first to the standard definition of the words used, reviewing both Black's Law Dictionary and Merriam Webster. Black's Law Dictionary defines "business" as (1) "A commercial enterprise carried on for profit; a particular occupation or employment habitually engaged in for livelihood or gain"; (2) "Commercial enterprises"; or (3) "Commercial transactions." *Business*, Black's Law Dictionary (11th ed. 2019). It defines "doing business" as "the carrying out of a series of similar acts for the purpose of realizing a pecuniary benefit, or otherwise accomplishing a goal[.]" *Doing Business*, Black's Law Dictionary (11th ed. 2019). The Merriam-Webster Dictionary defines "business" as "a usually commercial or mercantile activity engaged in as a means of livelihood" or "dealings or transactions of an economic nature." *Business*, Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/business.

The court found that "[s]ome common concepts emerge from these definitions." *Id.* at *5–6. First, "conducting business typically involves a regular series of transactions." And second, "these transactions generally provide a pecuniary benefit for the business entity." And then, importantly for this case, the court emphasized that "such transactions may or may not stem from a profit motive" as "some definitions include a profit motive and some do not." Some merely require a motive to obtain a pecuniary benefit or "a motive to sustain the 'livelihood,' or existence, of the enterprise." *See Livelihood*, Black's Law Dictionary (11th ed. 2019) (defining "livelihood" as "[a] means of supporting of one's existence"). *Id*.

It then turned to federal precedent regarding the definition of "engaging in business." In doing so, it considered the federal firearm statute, 18 U.S.C. § 921—the same statute Defendant

relies on here—along with the Child Protection and Obscenity Enforcement Act of 1988. In comparing these two statutes, the *Krassick* court found that where Congress intended "engaged in business" to require a profit motive, it has said so. For example, in 1986 Congress amended the firearm statute to include in the definition of "engaged in the business" of dealing firearms that the principal objective be for "livelihood and profit." *Id*. Additionally, when Congress enacted the Child Protection and Obscenity Enforcement Act of 1988, it "intentionally looked to the definition of 'engaged in the business'" found in the firearms dealer act, but "eliminated § 921's language requiring a 'princip[al] objective of livelihood and profit.'" *Id*. (citing *United States v. Skinner*, 25 F.3d 1314, 1318 (6th Cir. 1994)).

After this thorough examination of the plain meaning of the phrase "engaged in the business of"—the same phrase that appears in the VPPA—and surveying relevant legal authorities interpreting the phrase, the *Krassick* court concluded that a for-profit motive is not required in order for a person to be "engaged in the business of" selling something. It found that when "Congress intended 'engaged in the business' to require a profit motive, it expressly stated as much." *Id.* at *7. It further found that under both Black's Law and Merriam Webster's definitions of "business", one could be engaging in business if engaging in activity to support its *livelihood*, rather than obtain a profit. *Id*. Either way, the phrase "engaged in the business of" did not require a profit motive. *Id.*

This precise reasoning applies here. First, if Congress would have intended the VPPA to apply only to those in business for profit, it would have said so. *See e.g.* 47 U.S.C. § 227(a) (excluding calls placed by "tax exempt non-profit organization[s]" from the definition of "telephone solicitation" under the Telephone Consumer Protection Act). Here, Congress did not. Moreover, just like in *Krassick*, even under the definition Defendant asserts here—that the

business must be for the purpose of *livelihood or* profit—nonprofits can still be "engaged in business" to the extent they sell goods or services to support their livelihood rather than for profit. *Krassick*, 21-CV-180, 2022 WL 2071730, at *7 ("Furthermore, even the Sixth Circuit's interpretation of 'engaged in the business,' which ostensibly requires a purpose for 'livelihood *or* profit,' might apply to [nonprofit defendant] to the extent that [defendant] sells magazine subscriptions to support its *livelihood* rather than to obtain a profit.").

Consequently, this Court should follow the court in *Krassick* and find that Plaintiff has plausibly alleged that Defendant is a video tape service provider, as Plaintiff has alleged Defendant sells online prerecorded videos and those sales affect interstate commerce.

In sum, there is no basis in the text of the statute or existing caselaw to support Defendant's argument that nonprofits are *per se* excluded from the VPPA. On the contrary, as articulated above, the text of the statute and existing caselaw show that nonprofits can indeed be video tape service providers. *See also Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 156 (S.D.N.Y. 2023) (finding the text of the definition of video tape service provider "is unambiguous" and "it looks to a video's format, rather than its subject matter or *the provider's identity*") (emphasis added).

None of the other areas of law Defendant analogizes dictate otherwise. First, Defendant's reliance on the federal firearm statute, 18 U.S.C. § 921, cuts against its argument. As discussed by the court in *Krassick*, the history of the federal firearm statute shows that when Congress intends to limit "engaged in business" to for-profit motives only, it says so. Here, Congress did not include any such limitation. Therefore, there is none, and the VPPA does not apply only to those who sell, rent, or deliver videos for profit.

Further, Defendant mischaracterizes the holding in *United States v. Gross*, 451 F.2d 1355

(7th Cir. 1971) upon which it heavily relies in its firearm statute analogy. Defendant claims that *Gross* holds that the phrase "to engage in business" in the firearm statute requires a profit motive. Defendant also claims that the *Gross* court relied on the fact that the defendant had increased the price of the guns from the market value, "in order to make a profit," in finding there was sufficient evidence to support a conviction for dealing in firearms without a license. ECF No. 14 at 12–13. Neither assertion is correct. The Seventh Circuit found that "'dealer' means anyone who is engaged in *any* business of selling firearms, and that 'business' is that which occupies time, attention and labor for the purpose of livelihood or profit." *Gross,* 451 F.2d at 1357–58. The Court did not say a "profit" motive was required, but that the purpose must be for "*livelihood* or profit." *Id.* (emphasis added). As discussed above, something undertaken for livelihood does not mean the person undertakes it for profit and a nonprofit organization can certainly sell goods or services for its livelihood. Next, in finding sufficient evidence that the defendant in that case was an unlicensed arms dealer, the court did not rely on the fact that defendant had increased the price from the "market value of the guns" to earn a profit, as Defendant claimed. *See* ECF No. 14 at 12–13. The Seventh Circuit relied on the number of sales and the time period within which the defendant made them. *See Gross,* 451 F.2d at 1357–58 ("We conclude that on the evidence before us the statute here is not impermissibly vague and that the defendant's sale of eleven separate weapons within a reasonably short space of time clearly made him a dealer under the statutory definition."). *Gross* does not stand for the proposition that Defendant claims and does not mandate that to be "engaged in business," a company must have profit as its motive.

Defendant's second analogy to securities regulations falls similarly flat. Again, Defendant mischaracterizes the caselaw. Defendant claims the court in *SEC v. Carebourn Cap., L.P.*, 21-CV-2114, 2023 WL 6296032 (D. Minn. Sept. 27, 2023) held that whether a person was acting as a

broker-dealer under the statutory definition turns on whether the person seeks to generate profits. *See* ECF No. 14 at 13. That is not correct. Instead, the court in *Carebourn* listed a variety of factors to be considered in whether a person was acting as a broker-dealer. For example, one of the indicative factors of engaging in business triggering the dealer-registration requirement was a "high volume of buying and selling securities." *Id.* at *9 (citing *SEC v. Ridenour*, 913 F.2d 515, 517 (8th Cir. 1990) (concluding that defendant was a dealer where he engaged in a "level of activity" that "made him more than an active investor"); *SEC v. Keener*, 580 F. Supp. 3d 1272, 1282 (S.D. Fla. 2022) (stating other courts have similarly asked whether the involvement in buying and selling securities "involves more than a few isolated transactions"); *SEC v. Fierro*, 20-CV-02104, 2023 WL 4249011, at *5 (D.N.J. June 29, 2023) (considering volume of activity)). The amount of profit generated was simply one of many factors the court could look to in its determination.

Defendant's final analogy to social clubs also fails, as these cases are inapposite because they deal with definitions and application of specific technical state statutes. *See* ECF No. 14 at 14–15. And once again, Defendant mischaracterizes their holdings. None of the cases cited hold that in order to determine whether an entity is engaged in business, one must "ask whether the object of the organization is to generate profit," as Defendant claims. *See* ECF No. 14 at 15. And they do not hold that nonprofit organizations do not qualify as "businesses." *See id.* For example, the Court in *Svithiod Sing Club v. McKibbin*, 44 N.E.2d 904 (Ill. 1942) had to decide whether the Svithiod Sing Club was subject to a certain state tax. *Svithiod Sing Club*, 44 N.E.2d at 906. To do so, the court had to determine whether the club "held itself out as engaging in the business of selling such tangible personal property at retail," in this case food and beverages, or whether the sales of food and beverages were merely incidental to another purpose. *Id.* If the sales were the

primary purpose, the tax applied; if they were not, the tax did not apply. After a thorough factual analysis of Svithiod Sing Club's activities, the court found that its sales of food and beverages were merely incidental to the services it provided as a social club. The court was not presented with and did not analyze or decide whether a social club *per se* could ever be engaged in the business of selling tangible personal property. On the contrary, the very fact that the court had to conduct an in-depth factual analysis as to Svithiod's specific activities shows that nonprofits like Svithiod could indeed, in some instances, be engaged in the business of selling tangible personal property. Consequently, if anything, this case supports denying Defendant's motion.[2]

Finally, Defendant relies on *Cantu v. Tapestry, Inc.*, 22-CV-1974, 2023 WL 4440662 (S.D. Cal. 2023), claiming the court held that "an entity's purpose must be 'significantly tailored' to the monetization of videos to "garner liability under the VPPA." ECF No. 14 at 16. Again, the case

[2] The same is true of the other two cases Defendant cites. In *All One God Faith, Inc. v. Organic & Sustainable Indus. Standards, Inc.*, 183 Cal. App. 4th 1186 (2010), the court did not conclude that "a nonprofit trade association was not engaged in the business of selling or leasing goods" as Defendant claims. ECF No. 14 at 14. There, the court had to determine whether the defendant fell under a certain statutory exemption, that applied to "a person *primarily* engaged in the business of selling or leasing goods or services." *All One God Faith, Inc.*, 183 Cal. App. 4th at 1213 (emphasis added). Accordingly, the court conducted a thorough factual analysis of the activities of the nonprofit and found that the primary purpose of that particular nonprofit was not to sell or manufacture products, but to support its members that did so. *Id.*

Similarly, the Oregon Supreme Court, in *City of Coos Bay v. Aerie No. 538 of Fraternal Ord. of Eagles*, 179 Or. 83, 106 (1946), did not hold that the term "business" did not include a nonprofit, as Defendant claims. ECF No. 14 at 14. Instead, the court, after a thorough and lengthy analysis of the history local and state law and ordinances, found that "the authority granted by the legislature to the city of Marshfield to impose an occupation or privilege tax did not include the right to levy the tax on an enterprise such as the defendant lodge," whom it found, after a thorough factual analysis of the defendant's activities, was not operating for livelihood or profit. *City of Coos Bay*, 179 Or. at 106.

Thus the courts' in-depth factual analyses of the organizations' activities in Defendant's cited cases mean there are instances in which nonprofit organizations, depending on their specific activities, can be "engaged in business" under the definitions in the relevant statutes. Consequently, if anything, the decisions only confirm that Defendant's Motion should be denied.

holds nothing of the sort. Instead, *Cantu* found that the plaintiff had not pled sufficient facts to support an inference that "Defendant's business model [was] 'significantly tailored' *to the delivery of video content*, rather than 'peripherally' or 'passively' involved in such an exercise." *Cantu*, 22-CV-1974, 2023 WL 4440662, at *10 (emphasis added). The court found the plaintiff had to allege that defendant's business model was *significantly tailored to the delivery of video content*, not the monetization of videos. In fact, *Cantu* supports denying Defendant's motion. In its analysis, the *Cantu* court stated that "[t]he language 'engaged in the business' connotes 'a particular field of endeavor,' i.e. a focus of the defendant's work." *Id.* at *8 (internal citation omitted). Not only does this definition have nothing to do with profit, but under this definition, Plaintiff has pled sufficient facts to support a reasonable inference that selling and delivering prerecorded videos is Defendant's "particular field of endeavor" and the "focus of the defendant's work", and thus Defendant is a video tape service provider. *See* ECF No. 11 at ¶¶ 15, 78.

In sum, Defendant points to no legal basis to support its claim that nonprofits *per se* can never be engaged in the business of anything and thus can never be a video tape service provider under the VPPA. The cases Defendant cites to, and the analogies Defendant draws, do not hold so. Instead, Defendant asks this Court to insert an additional requirement into the VPPA's definition of video tape service provider where Congress did not do so. This Court should not heed Defendant's request.

The Complaint states a claim, and the Motion should be denied.

**B. Plaintiff has sufficiently pled that Defendant's videos are similar audio visual materials under the VPPA.**

Defendant argues that the videos it sells cannot be "similar audio visual materials" because of their particular content. In doing so, again, Defendant asks this Court to insert a new, content-based element into the VPPA. This Court should not, and indeed cannot, do so.

Specifically, Defendant argues that the videos it sells on its website are not "similar audio visual materials" because, based solely the asserted content of its videos, (1) they are not viewed for entertainment purposes, (2) Congress did not intend for the VPPA to cover videos whose content was continuing legal education because it was impossible for Congress to contemplate at the time of the VPPA's enactment that CLE courses would one day be done via prerecorded videos, and (3) nonconsensual disclosure to a third party of the educational videos a person purchases is not repugnant. ECF No. 14 at 22, 24–25. This argument has no basis in the text of the statute, and Defendant has not cited a single case in which a court found the definition of "similar audio visual materials" was limited by the content of the material. This Court should not be the first.

Initially, this Court cannot consider Defendant's myriad assertions about (1) the content of its videos (that its videos are only CLE courses), (2) the reason people purchase its videos (that no one purchases its videos for entertainment purposes), (3) Indiana requirements for CLE providers (that Indiana requires all CLE providers to report to the state the names of lawyers who attended their courses), or (4) the form of CLE courses available in 1988 (that prerecorded videos of CLE courses did not exist at the time of the passage of the VPPA). ECF No. 14 at 22–26. Even apart from the fact that these assertions are irrelevant, they are not alleged in the Complaint, and there is no other legal basis for this Court to consider them at the motion to dismiss stage.[3]

The Court's review is limited to the Complaint's factual allegations. Even if Defendant

---

[3] Additionally, Defendant's assertions regarding the availability of prerecorded CLE courses in 1988 are irrelevant. Defendant asserts that Indiana did not allow lawyers to take CLE courses via prerecorded video until 2006 and that Indiana requires CLE providers to report to the state the names of the lawyers who completed their courses within 30 days. ECF No. 14 at 24. Defendant states nothing about the rest of the country. Even if the Court could consider this assertion, and even if the Court found the text of the statute was ambiguous such that it could look to the legislative intent of the VPPA, what Indiana alone allowed with respect to CLE courses in 1988 is of no moment in determining congressional intent behind the VPPA.

were correct that the VPPA is content-based—and that is plainly not the case—the Complaint does not allege the content of the video materials Defendant sells. Thus, the Court would be required to deny the motion in any event as there is no basis for the Court to conclude that the unknown content of Defendant's videos precludes it from being a video tape service provider under the VPPA.

Even if the Court did have a basis to consider this argument, it fails on its merits. There is nothing in the text of the statute that supports making a content-based distinction between those materials that are "similar audio visual materials" and those that are not. The fundamental textual problem, then, with Defendant's argument is that it derives a content-based distinction between different genres of videos from a reference to a content-neutral term. To accept that argument, the Court would have to insert a new, content-based element into the statute by rewriting the text to read "prerecorded video cassette tapes *viewed for entertainment purposes only* or similar audio visual materials." That is a telltale sign of erroneous statutory interpretation, as courts "ordinarily resist reading words or elements into a statute that do not appear on its face." *Dean v. United States*, 556 U.S. 568, 572 (2009) (citing *Bates v. United States,* 522 U.S. 23, 29 (1997)). It is also an untenable position as it would be nigh impossible for courts to determine what videos were for educational versus entertainment purposes.[4]

Lacking a sound textual basis for its argument, Defendant invokes the purpose of the VPPA. It claims that Congress was "irate with the disclosure of *personal* video viewership, not

[4] Further, restrictions on transmission based on content could invoke constitutional concerns, and therefore, the statute must "be construed so as to avoid serious doubts as to [its] constitutionality." *Commc'ns Workers of Am. v. Beck*, 487 U.S. 735, 762 (1988) (citing *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council,* 485 U.S. 568 (1988) *Crowell v. Benson,* 285 U.S. 22 (1932). In other words, "when faced with such doubts the Court will first determine whether it is fairly possible to interpret the statute in a manner that renders it constitutionally valid." *Id*.

*professional* viewership" and that Congress's problem with the disclosure of Judge Bork's watchlist was that it contained his "favored Alfred Hitchcock films, spy thrillers, and British costume dramas" not videos he viewed for educational purposes. ECF No. 14 at 25. Therefore, Defendant argues, the statute must only cover videos viewed "for fun." *Id.* But again, Defendant cites no case in support.

Defendant then argues that Congress could not have intended for the VPPA to cover CLEs because Congress could not have imagined CLE courses would one day be available as on-demand videos. Defendant offers no basis for this assertion other than another baseless assertion that Indiana, one of fifty states, did not allow lawyers to take CLE courses via video in 1988. This is not a finding this Court can make at the pleadings stage as it would require significant evidence, and possible expert testimony, to prove. And Defendant would have to provide the same for all fifty states in order for it to be relevant at all. The Court should not narrow the text of the VPPA based on Defendant's unsupported assertions. *See Bostock v. Clayton County*, 590 U.S. 644, 655 (2020) (explaining that the Court could not narrow the plain meaning of Title VII based on "extratextual sources and our own imaginations"); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012) (explaining that "the purpose [of a statute] must be derived from the text, not from extrinsic sources such as legislative history or an assumption about the legal drafter's desires").

Finally, Defendant argues that Congress did not intend to capture CLE video courses in the VPPA because "no reasonable person views the content of an attorneys' CLE 'repugnant to the right of privacy today.'" ECF No. 14 at 25. Again, there is no basis for this claim in the text of the statute or the relevant case law. Further, a reasonable person would indeed view the disclosure *to Meta* of videos obtained from a CLE provider repugnant. A lawyer decides whether to submit a

completed CLE course to the state for credit. A lawyer, or any person for that matter, can purchase all the video CLEs he or she wants regardless of whether it is a requirement for the bar, and choose to submit one, all, or none. But that is the person's choice, not NBI's. Further, even if lawyers decide to submit their completion of online CLE courses to the state bar, they certainly do not agree that the state bar or the company providing the CLE course can send the titles of the courses (revealing the particular fields of interest to the person) to Facebook or other commercial entities, entities that use it barrage the customers with unwanted advertising and marketing.

Defendant does not and cannot cite to any cases where a court has held as defendant argues here. On the contrary, other courts have considered the same argument and rejected it. For example, in *Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 719–20 (N.D. Cal. 2023), the defendant argued that it was not a video tape service provider because it only distributed minutes-long education video clips, and those were not "similar audio visual materials" as they bore "no resemblance to the content the VPPA regulates." *Id.* There, the defendant opined, similar to Defendant here, that the VPPA was created with consumption of VHS tapes of feature films and television in mind and that the short, education-focused videos provided by defendant are too distinct to constitute audio-visual content under the statute. In that case, like Defendant here, the defendant did not "cite a single case finding that the length or *subject matter* of a video is relevant to determining coverage by the VPPA." *Id.* (emphasis added). The court found that the plaintiffs had plausibly alleged that the defendant was a video tape service provider. *See also Golden*, 688 F. Supp. at 156 (holding defendant was wrong "that the content on [its website] is outside the [VPPA's] intended reach" because the statute "looks to a video's format, rather than *its subject matter* or the provider's identity.") (emphasis added); *Collins v. Pearson Educ., Inc.*, 721 F. Supp. 3d 274, 279 (S.D.N.Y. 2024) (finding plaintiff plausibly alleged defendant was video tape service

provider where defendant was education media company that publishes and sells a wide variety of print and digital products).

Defendant asks this Court to insert a new, content-based element into the VPPA and does not offer a single case in support. The Court should not, and indeed cannot do so. Consequently, this Court should deny Defendant's motion as to this argument.

## II. Plaintiff sufficiently alleges that Defendant disclosed her personally identifiable information.

Contrary to Defendant's argument, Plaintiff clearly and sufficiently alleges that Defendant disclosed her personally identifiable information. The VPPA defines "personally identifiable information" as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C.A. § 2710(a)(3). Nearly all the courts that have considered this issue, have held that allegations that the defendant disclosed the plaintiff's Facebook ID along with the title or URL of the video he or she requested or obtained on the website, are sufficient to state a claim under the VPPA. *See*, *e.g.*, *Czarnionka v. Epoch Times Ass'n, Inc.*, 22-CV-6348, 2022 WL 17069810 (S.D.N.Y. Nov. 17, 2022) (finding plaintiff plausibly alleged defendant disclosed PII under VPPA where plaintiff alleged defendant disclosed FID and title and URL of video she requested); *Braun v. Phil. Inquirer, LLC*, No. 22-4185, 2023 WL 7544160, at *4 (E.D. Pa. Nov. 13, 2023) ("Most, if not all, courts to address the question have found, at the pleadings stage, that Facebook IDs are personal identifiable information."); *Collins*, 721 F. Supp. at 287–88 (finding plaintiff plausibly alleged defendant disclosed PII under VPPA where plaintiff alleged defendant disclosed FID and title and URL of video she requested); *Mendoza v. Caesars Ent., Inc.*, No. 23-CV-03591, 2024 WL 2316544, at *4 (D.N.J. May 22, 2024) (same); *Li v. Georges Media Grp. LLC*, No. CV 23-1117, 2023 WL 7280519, at *4 (E.D. La. Nov. 3, 2023) (same); *Golden*, 688 F. Supp. at 150 (same); *Sellers v. Bleacher Rep., Inc.*, 23-CV-00368,

2023 WL 4850180, at *5 (N.D. Cal. July 28, 2023) (same); *Jackson v. Fandom, Inc.*, 22-CV-04423, 2023 WL 4670285, at *4 (N.D. Cal. July 20, 2023) (same); *Harris v. Pub. Broad. Serv.*, 22-CV-2456, 2023 WL 2583118, at *5 (N.D. Ga. Mar. 20, 2023) (same); *Feldman v. Star Tribune Media Co. LLC*, 659 F. Supp. 3d 1006, 1020–1021 (D. Minn. Mar. 7, 2023) (same); *Belozerov v. Gannett Co.*, 646 F. Supp. 3d 310, 314–315 (D. Mass. 2022) (same); *Stark v. Patreon, Inc.*, 635 F. Supp. 3d 841, 853 (N.D. Cal. 2022) (same); *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 184 (S.D.N.Y. 2015) ("A Facebook ID . . . is thus equivalent to a name—it stands in for a specific person, unlike a device identifier"); *In re Hulu Priv. Litig.*, 11-CV-03764, 2014 WL 1724344, at *14 (N.D. Cal. Apr. 28, 2014) ("The Facebook User ID is more than a unique, anonymous identifier. It personally identifies a Facebook user. That it is a string of numbers and letters does not alter the conclusion. Code is a language, and languages contain names, and the string is the Facebook user name."); *Lamb v. Forbes Media LLC*, 22-CV-06319, 2023 WL 6318033, at *10 (S.D.N.Y. Sept. 28, 2023) ("The [complaint] here alleges that Defendant disclosed the Plaintiffs' Facebook IDs and the URLs—including the video title—of the videos they accessed, and therefore the [complaint] adequately alleges that Forbes disclosed "specific video materials.""").[5]

Here, the Complaint alleges just that: that Defendant installed the Meta Pixel on its website, that when Plaintiff or any other customer with a Facebook page viewed a video, added it to cart, initiated checkout, and purchased a video, Defendant transmitted to Meta the person's FID, along with the title and URL of the video the person requested. ECF No. 11 ¶¶ 2, 3, 11, 42, 46, 52, 58, 61, 63, 69. Consequently, Plaintiff has sufficiently alleged that Defendant disclosed her PII to Meta

[5] Defendant claims that "courts have expressed extreme skepticism" over the viability of what it calls "adtech" claims, meaning claims about tracking technology used for targeted advertising. ECF No. 14 at 19. This is simply not true, as can be seen in the multitude of cases in this citation in which courts denied motions to dismiss in cases with nearly identical VPPA claims and allegations.

in violation of the VPPA.

Defendant, however, ignores this multitude of cases and argues that Plaintiff must allege that her "Facebook profile was 'public' and that "her profile contained 'identifying information' within the meaning of the VPPA." ECF No. 14 at 21. Both contentions are wrong and contradict nearly every court to decide this issue. As stated above, Plaintiff alleges that Defendant transmitted to Meta her FID, which allows Meta and any ordinary user to lookup her Facebook profile and identify her by name. ECF No. 11 at ¶ 52. That alone is sufficient to plausibly allege disclosure of PII. *See Lamb v. Forbes Media LLC*, No. 22 Civ. 06319 (ALC), 2023 WL 6318033, at *10–11 (S.D.N.Y. Sept. 28, 2023) (disclosure of Facebook ID constituted PII within the meaning of VPPA); *Czarnionka*, 2022 WL 17069810, at *3 ("Facebook need not link the disclosed FID to personal information obtained elsewhere. The FID itself represents a particular individual."); *see also supra*, 23–24.

Moreover, even if Plaintiff were required to allege that her profile contained additional "identifying information" beyond the FID, she has done so—she alleges that her Facebook profile contains her name and other identifying information (ECF No. 11 at ¶ 3) and that her FID allows an ordinary person to lookup her Facebook profile and identify her by name. *Id.* at ¶ 46. A name, along with the title of the video, is certainly sufficient to identify a specific person as having requested or obtained videos from Defendant's website. Consequently, Plaintiff has plausibly alleged Defendant disclosed her PII in violation of the VPPA.

Defendant's cases do not provide otherwise. Defendant relies on *Wilson v. Triller, Inc.*, 598 F. Supp. 3d 82 (S.D.N.Y 2022) and *Solomon v. Flipps Media, Inc*, 22-CV-5508, 2023 WL 6390055 (E.D.N.Y. Sept. 30, 2023), neither of which support granting Defendant's motion. To start, once again, Defendant mischaracterizes the holding in *Wilson*. Defendant claims the *Wilson*

court found the plaintiff "needed to allege that her public Facebook profile page contained identifying information about her in order to state a plausible claim." ECF No. 14 at 21. However, that quote is nowhere in *Wilson*. In fact, *Wilson* does not hold anything about what information the complaint must allege is contained on a Facebook profile because the case is not about a Facebook profile, or an FID. The case is about an app called "Triller" that was allegedly transferring PII to its corporate affiliates Facebook and Appsflyer. *See generally*, *Wilson*, 598 F. Supp. at 82.

Further, *Wilson* is easily distinguishable. In *Wilson*, the complaint alleged that Triller was transmitting a "user ID", or UID, created by Triller. The UID is different from an FID because, "according to the complaint, *it is not this information alone* that allows Facebook and Appsflyer to 'easily associate UIDs with the individual user.'" *Id.* (emphasis added). Rather, the complaint alleged that, "in order to make this association, the third party must 'pair' the UID with information from a user's Triller profile page, which may or may not contain various personal information about the user, such as any information included in the 'About Me' page or a URL associated with a photograph of the user." *Id.* at 92.

In contrast, the Complaint here alleges that it is the FID alone that allows Facebook, and any other ordinary person, to "easily associate the [FID] with the individual user." As alleged in the Complaint, "[w]ith only a person's FID and the video content name or URL that the person requested on Defendant's website—all of which Defendant knowingly provides to Meta—any ordinary person could learn the identity of the person to whom the FID corresponds and the specific video products or services that this person requested." ECF No. 11 at ¶ 63. That is so because "entering 'facebook.com/[FID]' into a web browser returns the Meta profile of the person to whom the FID corresponds." ECF No. 11 at ¶ 3.

*Solomon* also does not support Defendant's argument.[6] In *Solomon*, the plaintiff did not allege anything about what her Facebook account, or any Facebook account, contained. *See Solomon*, 2023 WL 6390055 at *2–3. In contrast, Plaintiff here alleges that her, and all Facebook profiles, contain the person's name, along with other personally identifying information about the customer. ECF No. 11 at ¶ 3. Plaintiff further alleges that if someone has the FID, that person can "look up the user's unique Meta profile and thus identify the user by name." *Id.* at ¶ 46. Allegations that Defendant transmitted an FID that reveals the person's name combined with the title of the video requested or obtained are sufficient for this Court to reasonably infer that Defendant transmitted information sufficient to identify a person as having requested or obtained specific video materials or services from a video tape service provider.

In fact, the court in *Solomon* recognized as much, distinguishing the allegations in its case—where the plaintiff alleged nothing about what the Facebook profile contained—from the allegations in *Feldman*, 2023 WL 2388381, where the court denied a motion to dismiss because the complaint alleged that the defendant transmitted the FID and the plaintiff's Facebook profile contained his name, "making it feasible to identify him by reference to this information." *Id.* at *3.

The remainder of the cases cited by Defendant, those it calls "adtech" cases, are inapposite, as they did not address the definition of PII in the VPPA, but the transmission of protected health information via tracking technology. In those cases, the plaintiffs had not alleged what *type* of information they provided the defendant on the websites, and subsequently what type of information the defendant transmitted to a third party. Consequently, the courts could not reasonably infer from the allegations that the *type* of information transmitted was the type of

[6] *Solomon* is currently on appeal in the Second Circuit. *See Solomon v. Flipps Media, Inc.*, 23-7597 (2nd Cir. 2023). Oral argument occurred on May 13, 2024, and the case is awaiting a decision.

information protected by the various health laws, none of which were the VPPA. *See*, *e.g.*, *Santoro v. Tower Health*, 22-CV-4580, 2024 WL 1773371, at *4 (E.D. Pa. Apr. 24, 2024) (granting motion to dismiss where plaintiff did not specify what information he communicated to defendant such that the court could not "tell whether that information might be covered by HIPAA."); *Doe v. Davita Inc.*, 23-CV-01424, 2024 WL 1772854, at *2 (S.D. Cal. Apr. 24, 2024) (same); *Nienaber v. Overlake Hosp. Med. Ctr.*, 23-CV-01159, 2024 WL 2133709, at *4 (W.D. Wash. May 13, 2024) ("Plaintiff vaguely states that she 'communicate[d] with healthcare professionals' and 'complete[d] medical forms'" but made "no allegations as to the type of information she provided to Defendant through MyChart or that Defendant transmitted Private Information *of hers* to third parties through the Private Patient Portal"; further, the "example" the plaintiff provided in a screenshot was of a different webpage from the one she alleged contained the tracking technology); *Smart v. Main Line Health*, 22-CV-5239, 2024 WL 2943760, at *3 (E.D. Pa. June 10, 2024) ("Plaintiff fails to state what specific HIPPA-protected information Plaintiff *himself* provided to Defendant via his browsing activity that was subsequently disclosed to Meta."); *Doe v. Amgen, Inc.*, No. 2:23-CV-07448-MCS-SSC, 2024 WL 575248, at *3 (C.D. Cal. Jan. 29, 2024) ("[Plaintiff] fails to allege plausibly the collection of her personal information took place on the sign-up and re-enrollment page of Defendant's website where the pixels were purportedly embedded, and she fails to explain what information the pixels provided Defendant and subsequently what information Defendant provided to the Advertising Tracking Companies.").[7]

[7] Defendant also cites to *T.D. v. Piedmont Healthcare, Inc.*, 23-CV-5416, 2024 WL 3972984, at *2 (N.D. Ga. Aug. 28, 2024), which is particularly inapposite. The plaintiff there brought claims of intrusion upon seclusion, breach of fiduciary duty, negligence, breach of contract, unjust enrichment, and violations of Electronic Communications Privacy Act. The court found the plaintiff failed to state a claim because he voluntarily provided the information at issue to the

What this Court can draw from these cases is that a plaintiff must specify the *type* of information it alleges the defendant transmitted, in order to determine whether the information transmitted is the type of information protected by the statute. Plaintiff clearly alleges that here. The VPPA prohibits disclosure of information that identifies a person as having requested or obtained specific videos or other services from a video tape service provider. That is precisely the type of information Plaintiff alleges Defendant transmitted in this case: her FID, which connects to her Facebook profile containing her name and other identifying information, along with the title of the videos she purchased. ECF No. 11 at ¶¶ 3, 42, 52. These allegations allow this Court to reasonably infer that Defendant transmitted the *type* of information that is protected by the VPPA.

Defendant's argument that Plaintiff is relying only on "hypothetical screenshots" is a red herring, meant to distract this Court from the damning evidence the screenshots contain of Defendant's disclosure of its customers' PII to Meta. As repeatedly cited above, Plaintiff does not rely on vague hypotheticals, but alleges specifically that Defendant disclosed to Meta her FID that is connected to her Facebook account that contained her name, along with the titles and URLs of the videos she purchased from Defendant's website. The Complaint alleges that Defendant systematically transmitted all of its Facebook-enrolled customers' video purchase-related details to Meta in the same manner, and that the screenshots reflect the way in which customers' data was transmitted pursuant to that uniform, standardized practice. Defendant ignores this and confusingly seems to argue that Plaintiff is required to provide screenshots or other definitive proof of Defendant's transmissions of Plaintiff's information to Meta at the time she purchased videos from Defendant in order to state a claim. ECF No. 14 at 19 ("Harper does not include any facts or screenshots of the webpage she alleges she visited, let alone from the time she alleges she visited

---

defendant. Thus, defendant could not intrude upon the plaintiff's seclusion.

it.") That is not the standard required for a plaintiff to state a claim. A plaintiff need only make a plausible claim, and "a claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678. Here, Plaintiff has done so. The screenshots aid Plaintiff's work by showing this Court proof of the specific information Defendant was transmitting to Meta through the use of the Meta Pixel on its website. This Court can use those screenshots to draw reasonable inference that Defendant transmitted precisely the same type of information when Plaintiff bought a video on Defendant's website, just as Plaintiff alleges.

Defendant does not and cannot cite to any case that has held a plaintiff must allege more than Plaintiff has alleged here to support an inference that Defendant disclosed her PII to Meta. The Motion should be denied on this ground.

## CONCLUSION

For the reasons stated above, this Court should deny Defendant's motion in its entirety.

Dated: December 17, 2024

Respectfully submitted,

**HEDIN LLP**

*/s/ Julie Holt*

JULIE HOLT
FRANK S. HEDIN
HEDIN LLP
1395 BRICKELL AVE., SUITE 610
MIAMI, FLORIDA 33131-3302
TELEPHONE: (305) 357-2107
FACSIMILE: (305) 200-8801
FHEDIN@HEDINLLP.COM
JHOLT@HEDINLLP.COM

*Attorneys for Plaintiff and the Putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that on December 17, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will provide electronic notification of such filing to all parties of record and served a copy via email on Defendant's retained counsel.

*/s/ Julie Holt*